1

2

3

4

5

6

7

8                         **UNITED STATES DISTRICT COURT**

9                         **CENTRAL DISTRICT OF CALIFORNIA**

10

11   JULIA A. OAWSTER,                  )   NO. CV 10-07001 SS
                                        )
12                   Plaintiff,         )
                                        )
13            v.                        )
                                        )   **MEMORANDUM DECISION AND ORDER**
14   MICHAEL J. ASTRUE,                 )
     Commissioner of the Social         )
15   Security Administration,           )
                                        )
16                   Defendant.         )
     _____)

17

18                                 **I.**

19                            **INTRODUCTION**

20

21        Julia  A.  Oawster  ("Plaintiff")  brings  this  action  seeking  to

22   overturn  the  decision  of  the  Commissioner  of  the  Social  Security

23   Administration  (the  "Commissioner")  denying  her  application  for

24   disability insurance benefits and Supplemental Security Income ("SSI")

25   benefits.  The parties consented to the jurisdiction of the undersigned

26   United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  For the

27   reasons stated below, the decision of the Agency is AFFIRMED.

28   \\

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for SSI on July 18, 2003, alleging a disability onset of March 30, 2001, due to diabetes, coronary artery disease, double bypass surgery, spondylolisthesis at L4-5, and a suspicion of breast cancer.   (Administrative Record ("AR") 210-19). The agency denied Plaintiff's claim on November 18, 2003.  (AR 85-89). On January 12, 2004, Plaintiff requested a hearing before an Administrative Law Judge, which was held on October 21, 2004.  (AR 90, 130-65).  On January 10, 2005, the ALJ issued an unfavorable decision. (AR 70-84).  Plaintiff requested review of the ALJ's decision and the Appeals Council remanded the case for further proceedings on October 20, 2005.  (AR 43, 179-80).  A second hearing with Administrative Law Judge James Goodman (the "ALJ") was held on February 13, 2007.  (AR 41-68). On April 7, 2008, the ALJ issued an unfavorable decision.  (AR 20-35). Plaintiff again requested review of the ALJ's decision.  (AR 18-19). The Appeals Council denied her request for review on July 15, 2010, and the ALJ's decision became the final decision of the Commissioner.  (AR 8-10, 18).  Plaintiff's Complaint, filed on September 27, 2010, seeks review of the ALJ's decision denying her disability benefits.

## III.

### FACTUAL BACKGROUND

Plaintiff was born on October 31, 1960.  (AR 133, 187).  Plaintiff is a high school graduate.  (AR 133).  She previously held certificates as a medical assistant and an emergency medical technician.  (Id.).  Her

2

1  application alleges disability beginning on March 30, 2001 due to
2  diabetes, coronary artery disease, double bypass surgery,
3  spondylolisthesis at L4-5, and a suspicion of breast cancer. (AR 211).
4  Plaintiff testified that she worked as a "dispatcher" of ambulances and
5  medical vans for a company now known as "Krippens" since 1984, but
6  stopped working in March of 2001 after she suffered a neck injury in a
7  non-work related car accident. (AR 134-36). Plaintiff stated that
8  "[she] was still willing to come in and work [after the accident]. But
9  a couple days later is when [her employer] decided to lay [her] off."
10 (AR 136). According to Plaintiff, her employer was "downsizing" and,
11 when she told her employer she could not come back in, the employer
12 "laid [Plaintiff] off."  (AR 135).

13
14 **A.   Plaintiff's Medical History**
15
16     **1. ALJ Hearings**
17
18     Plaintiff testified that her heart condition began in October 2002.
19 (AR 136). Although Plaintiff's test results in 2001 were normal, she
20 required bypass surgery on October 24, 2002. (AR 136-37). Plaintiff
21 stated that after the surgery she had "[l]ess chest pain [and it was]
22 easier to breathe." (AR 137). As of the date of her first
23 administrative hearing on October 21, 2004, Plaintiff noted that she
24 continued to have chest pain "[o]nce a week" and it lasted about "a
25 half-an-hour." (Id.). Plaintiff stated that when she felt chest pain
26 and took nitroglycerine the pain "goes away within about 10 minutes."
27 (AR 138). After taking nitroglycerine Plaintiff testified that she
28 "get[s] tired afterward" and "rest[s] for about an hour." (Id.). A

1 "treadmill test" completed just prior to the first hearing indicated
2 that Plaintiff had "no new blockages" and Plaintiff's doctor "wanted to
3 keep [her] on the nitroglycerine to see if that would keep the chest
4 pains away."  (AR 148).

5

6     In 2004, Plaintiff stated that she has been diabetic for 14 years
7 and takes "two different insulin tablets." (AR 139).  Plaintiff further
8 noted that she suffers from hypothyroidism, but it is controlled with
9 medication.  (AR 140).  Plaintiff also suffers from elevated
10 cholesterol, but is controlling her cholesterol with diet.  (Id.).
11 Further, Plaintiff noted in 2004 that she has neck, shoulder, and lower
12 back pain and suffers from spondylolisthesis.  (Id.).  Plaintiff
13 testified that the pain "come[s] and go[es]" and that her shoulder pain
14 was monthly, while her neck and lower back pain were daily.  (AR 141).
15 Plaintiff took non-prescription Tylenol which gave her some relief.
16 (Id.).  Plaintiff stated that she had difficulty sitting and walking
17 when her back pain was severe.  (Id.).  She noted that she could only
18 walk for about fifteen minutes and also had discomfort when sitting.
19 (AR 141-42).  When Plaintiff has back pain, she stated that she has
20 difficulty bending at the waist, so she usually squats down instead.
21 (AR 142).  Plaintiff indicated that her shoulders hurt "just about
22 [every] day depending on what . . . [she] tried to lift."  (Id.).
23 Plaintiff also takes Tylenol for her shoulder pain.  (AR 143).

24

25     The medical expert ("ME"), Dr. Thomas Maxwell, present at
26 Plaintiff's first hearing stated that he disagreed with Plaintiff's
27 treating physician, who concluded that Plaintiff is in a permanent state
28 of incapacity.  (AR 153).  The ME stated:

1    I just reach a different opinion simply because I don't
2    really have a lot of details as to how they [INAUDIBLE]
3    opinion.  So my own opinion based on the record [INAUDIBLE]
4    would be the ability to lift and /or carry both frequently
5    and occasionally 10 pounds, to sit for six hours with the
6    ability to stand at will to relieve discomfort, to stand
7    and/or walk for two hours, and then postural limitations as
8    far as [INAUDIBLE] crouching, crawling, stooping to
9    occasional but no climbing of ladders, ropes, or scaffolds,
10   other climbing to be occasional.  And then manipulative
11   limitation as far as reaching overhead in both upper
12   extremities to occasional.  And then just environmental as
13   far as excessive exposure to temperature and other things
14   such as humidity and [INAUDIBLE].

16   (AR 153-54).[1]  Dr. Maxwell further noted that no pulmonary function
17   tests were completed and that while Plaintiff did have "moderate
18   cardiomegaly" after her surgery, the condition was not ongoing.  (AR
19   154-55).

21   At the February 13, 2007 hearing, Plaintiff testified that her
22   "physical limitations, [her] heart, [her] back, [her] shoulders, [and]
23   her hands" continued to prevent her from working.  (AR 49).  Plaintiff
24   noted that if she "exert[s] herself too much by lifting, doing anything
25   heavy, pushing a vacuum sweeper too far, too long, [her] chest starts

27        [1]  The Court notes that several of the questions and answers between
28   the ALJ and the ME at the October 21, 2004 hearing were deemed
     "inaudible."  (See AR 155-56).

5

hurting.   It feels like something's sitting on [Plaintiff's] chest."
(AR 50).   Plaintiff most recently visited the emergency room in August
2006 because her chest pain did not stop after taking nitroglycerin at
home.   (AR 51).   Plaintiff noted that starting six months before the
second hearing, her chest pain occurred "monthly" and prior to that
period the frequency of her chest pain was "[a]bout every six months."
(AR 52).    Plaintiff    attributed    the    increased    frequency    to    her
performance of more household chores and "stress of the bills."   (AR
53).

Plaintiff also noted that after the surgery she "was put on Lipitor
to lower [her] cholesterol, and one of the side effects [was] muscle
pain and it go to where [Plaintiff] couldn't walk or sit up, and they
did an MRI, and they found out that [Plaintiff has] arthritis in [her]
lower back."   (AR 55).   She experiences a "sharp pain" that "radiates
down to [her] legs" as a result of the arthritis.   (Id.).   Plaintiff
noted that the severe pain occurs "every three or four days" depending
on how much she walks and sits.   (Id.).   In addition to the severe pain,
Plaintiff testified that the symptoms pertaining to her back pain have
become worse, and she feels less severe, "like a soreness," pain daily.
(AR 56).

Plaintiff also described a "sharp" pain in her left shoulder.
(Id.).   The symptoms in her left shoulder first arose in 2000.   (AR 57).
She noted that she has "a torn ligament" in that shoulder.   (AR 56).
Plaintiff testified that she has limitations reaching with her left arm,
reaching out in front of her, to the side, and behind her, as well as
reaching overhead.   (AR 57).   Plaintiff also testified as to having pain

6

emanating from her hands.  She "had carpal tunnel surgery in '94 and '95."  (AR 58).  Plaintiff noted that she underwent two procedures on her left hand, as well as one procedure to her right hand in 1993."  (Id.).  Additionally, Plaintiff has also been taking insulin, Glucophage and Glyburide, since 2000 for diabetes.  (AR 58-59).

Because of the Plaintiff's symptoms resulting from her heart and back, she testified that she requires periods of rest during the day.  (AR 59).  Plaintiff noted that she lies down, "twice a day," (id.), for "[a]bout an hour."  (AR 60).  Plaintiff also noted that over the course of the past year, the need to lie down is "more frequent now than what it was."  (Id.).  Her overall energy levels are "lower than what it used to be" and there are periods of time she feels fatigued.  (Id.).  Plaintiff testified that "[t]rying to do too much housework, or take care of [her] daughter," cause the fatigue.  (Id.).  Finally, Plaintiff does not wear a back brace of any sort and attributes a weight loss from 250 pounds at the time of the August 2001 hearing to 180 pounds during the February 2007 hearing to a cut down "on eating, and trying to do a lot more walking."  (AR 65).

**2. Treatment Records**

On her "Disability Report," Plaintiff stated that a car accident in March of 2001 had caused her to stop working.  (AR 210-19).  As part of her worker's compensation claim, Plaintiff visited Dr. Ralph Steiger in December 2001.  (AR 423).  At the request of Dr. Steiger, Plaintiff had a magnetic resonance imaging (MRI) scan of her cervical spine and

left scapula, which showed a two to three millimeter disc bulge at C5-6 and a normal left scapula. (AR 28, 423-29).

Later, in October 2002, after complaining of chest pains, Plaintiff was referred to Dr. Dandekar at Citrus Valley Medical Center for coronary bypass graft surgery. (AR 301-03, 455-57). By January of 2003, doctors noted that Plaintiff was "Feeling well. Active. Ambulatory. No chest pains." (AR 359). Further reports in April 2003 and July 2003 also confirmed that Plaintiff was feeling well. (AR 346, 355, 357).

In October 2003, Tina Moy, a non-physician State Agency Disability Analyst, reviewed Plaintiff's prior medical records and determined that Plaintiff could lift or carry twenty pounds occasionally, and ten pounds frequently. (AR 223-38). Ms. Moy also concluded that Plaintiff could stand or walk for a total of about six hours in an eight-hour workday. (AR 229-35, 382). Later, in April 2004, Dr. Bhupinder Bains, Plaintiff's treating physician, found Plaintiff incapacitated from work because of coronary artery disease status post coronary artery bypass graft, diabetes mellitus, and hypothyroidism. (AR 420). He also concluded that the date for this incapacity was October 2002, and that this incapacity was permanent. (Id.).

On August 17, 2004, Plaintiff returned to Dr. Gadgil, who had examined Plaintiff before her surgery. (AR 489-91). In contrast to Dr. Bains's findings, Dr. Gadgil determined that Plaintiff's overall cardiac status was "normal" and advised her to continue her current activities and medications. (AR 490). In a later visit to Dr. Gadgil in September

8

1  2004, he also noted that Plaintiff's echocardiogram was "unremarkable."

2  (Id.).  After Plaintiff underwent a stress test in October 2004, there

3  was no evidence of hemodynamically significant coronary artery disease

4  and no significant perfusion abnormality.  (AR 430).  It was also

5  discovered in that stress test that Plaintiff had normal left

6  ventricular size, global function, and ejection fraction at rest.

7  (Id.).  Further, in January 2005, Dr. Roy Kaku, assessed her as

8  "asymptomatic and hemodynamically stable."  (AR 503).

9

10  Plaintiff also had an x-ray taken of her lumbar spine after

11  complaining of back pain in May 2003.  (AR 552).  The x-ray showed very

12  slight anterolisthesis of L5 on S1 with a subtle irregularity suggestive

13  of a pars defect.  (AR 28, 552-54).  In September 2003, Plaintiff was

14  diagnosed with spondylolisthesis at L5 with first degree

15  spondylolisthesis of L5 on S1.  (AR 28, 372).

16

17  **3. Consultative Sources**

18

19  On September 3, 2003, Dr. Sahniah Lambert performed a comprehensive

20  "Internal Medical Evaluation" at the request of the Department of Social

21  Services.  (AR 365).  Based on Plaintiff's physical examination with Dr.

22  Lambert and Plaintiff's medical history, Dr. Lambert recommended that

23  Plaintiff be "limited to pushing, pulling, lifting, and carrying 20

24  pounds occasionally and 10 pounds frequently."  (AR 369).  Dr. Lambert

25  also recommended that "[s]tanding, walking and sitting can be performed

26  without restriction," and "[p]ostural activities, including bending,

27  kneeling, stooping, crawling, and crouching," can too be performed

28  without restriction.  (Id.).  Additionally, Dr. Lambert concluded that

1  "[a]ctivities that require agility, such as climbing ladders, working
2  on uneven terrain, or working at heights, should be avoided because of
3  the known history of coronary disease." (Id.).

4

5  Dr. Sam Mouazzen also conducted an evaluation of Plaintiff on
6  October 25, 2006. (AR 557-59). Based on that evaluation, Dr. Mouazzen
7  concluded that Plaintiff "showed basically no evidence of cardiac
8  decompensation," and that "[i]n spite of her symptoms, the patient
9  appears to be able to do her usual activities quite well without any
10 limitations." (AR 559). In sum, Dr. Mouazzen recommended that
11 Plaintiff's symptoms are "not disabling." (Id.).

12

13 Dr. Mouazzen later conducted another examination of Plaintiff on
14 March 14, 2007 for the Department of Social Services. (AR 590-92).
15 Although Dr. Mouazzen did not make any specific recommendations as to
16 Plaintiff's symptoms, the ALJ examined Dr. Mouazzen's March 2007 report.
17 (AR 24). The ALJ believed Dr. Mouazzen found "no significant change
18 from his October 2006 report," and determined that "the narrative
19 contained in Dr. Mouazzen's March 2007 report, as supported by his
20 October 2006 report, was internally consistent and correlated with the
21 [Plaintiff's] medical history." (AR 24, 592).

22

23 **4. Vocational Expert Testimony**

24

25 Dr. Martin Broadwin, a vocational expert ("VE"), testified at
26 Plaintiff's 2001 hearing. (AR 157-62). Dr. Broadwin testified that
27 Plaintiff could not perform any of her past work but could perform other
28 sedentary semi-skilled occupations. (AR 158). He testified that based

on the limitations pertaining to Plaintiff, she could perform a job where "she could sit for six hours out of eight but would have to stand up to relieve some discomfort." (AR 160). The VE cited jobs such as, order clerk, routing clerk, and referral clerk. (AR 158-59). Further, Dr. Broadwin testified there existed "1,150" order clerk jobs "in southern California," "1,100" routing clerk jobs and "900" referral clerk jobs in "the southern California region." (AR 159). He also testified that based on limitations pertaining to Plaintiff, she could also perform sedentary unskilled jobs, such as product marker or labeler, unskilled inspection clerk or inspector, and product folder. (AR 34, 160). Dr. Broadwin noted that there existed "2,300" product marker or labeler jobs "in this region of the country," "5,000" unskilled inspection clerk or inspector jobs and "2,500" product folder jobs "in this region of the country." (AR 160).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[2] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable

---

[2] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. § 416.920.  The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled. If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. § 416.920(b)-(g)(1).

12

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54. Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"),[3] age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

## V.

## THE ALJ'S DECISION

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled under the Social Security Act.

---

[3]     Residual functional capacity is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

13

(AR 23-35).  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 30, 2001.  (AR 26). At step two, the ALJ found that Plaintiff had a severe combination of impairments including:

> [N]on-insulin-dependent diabetes mellitus; hypertension (controlled); coronary artery disease, status post coronary artery bypass graft done in October 2002; obesity (improved); hypothyroidism (controlled); osteoarthritis of the lumbosacral spine; osteoarthritis of the right shoulder; hyperlipidemia; and benign breast masses.

(AR 27).  At the third step, the ALJ found that the severe impairments at step two did not meet or medically equal a listed impairment.  (Id.) At step four, the ALJ considered Plaintiff's medical history to determine Plaintiff's RFC.  Dr. Lambert, a consultative examiner, found Plaintiff could stand, walk and sit "without restriction."  (AR 30, 369).  However, based on the testimony of medical expert Dr. Maxwell, the ALJ decided to place greater restrictions on Plaintiff's RFC.  (AR 27-33).  As such, the ALJ found that Plaintiff had the following RFC:

> [T]o lift or carry ten pounds occasionally and frequently. She can stand or walk for a total of two hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday, with the opportunity to stand at will.  She must never climb ladders, ropes, or scaffolds, but she may occasionally climb ramps and stairs.  She can occasionally balance, stoop, kneel, crouch, and crawl.  She can

14

occasionally reach overhead.  She must not have excessive exposure to temperature extremes, humidity, and irritants. She should also avoid more than average levels of stress.

(AR 28). At step five, the ALJ found that based on Plaintiff's relatively young age, 47, high school education, past work experience, and RFC, she could perform jobs existing in significant numbers in the national economy. (AR 34).  Semi-skilled jobs Plaintiff could perform include, "1) Order Clerk; 2) Routing Clerk; and 3) Referral Clerk." (Id.).  Sedentary, unskilled jobs Plaintiff could perform include, "1) Product Marker; 2) Inspector; and 3) Product Folder." (Id.).  The ALJ relied on the testimony of the vocational expert, Dr. Broadwin, to make this determination.  (Id.).  Because the ALJ found that Plaintiff can perform other occupations with jobs existing in significant numbers in the national economy, he concluded that Plaintiff is not disabled. (AR 34-35).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

## DISCUSSION

Plaintiff contends the ALJ erred because the ALJ improperly relied on the Vocational Expert testimony to conclude that Plaintiff could perform work other than her past relevant work. (Memorandum in Support of Plaintiff's Complaint ("Complaint Memo.") at 7). Specifically, Plaintiff contends that the Vocational Expert "impermissibly assumed a capacity that neither ALJ decision affirmed found to exist." (Id.). For the reasons discussed below, the Court disagrees with Plaintiff's contentions and concludes that the ALJ's decision should be AFFIRMED.

16

A.   **The ALJ Properly Relied On The Vocational Expert's Testimony Because the Vocational Expert Did Not Assume A Capacity In Excess Of The RFC**

"The hypothetical an ALJ poses to a vocational expert, which derives from the RFC, must set out all limitations and restrictions of a particular claimant." Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009) (internal quotation marks omitted). However, "[a]n ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." Osenbrock v. Apfel, 240 F.3d 1157, 1664-65 (9th Cir. 2001).

Here, the ALJ posed the following hypothetical question to the VE:

Now, the vocational profile that we have here is an individual who is 42 years old [INAUDIBLE], high-school graduate, plus additional training as she described earlier and is no longer employed, work [INAUDIBLE] described. Now, assume first that she has [INAUDIBLE].[4]

(AR 157). Based on this hypothetical, the VE testified that such a Plaintiff would not be able to perform the occupation of motor vehicle dispatcher, which was Plaintiff's previous position. However, the VE

---

[4]   It is unfortunate that certain words in the transcript are labeled "inaudible." However, after reviewing the record in its entirety, the Court finds that the defects in the record are not material to the Court's review of Plaintiff's claim. Notably, Plaintiff did not seek a remand based upon defects in the record.

1  noted that Plaintiff would have transferable skills in clerical areas,
2  such as:

4        [C]ommunication and organizational skills and abilities,
5        knowledge of the [INAUDIBLE] vehicles, ability to do the
6        paper work and clerical activities involved in the vehicle's
7        [INAUDIBLE] and personnel.  I believe – I'm sorry –
8        [INAUDIBLE] direct activities of drivers and communicate a
9        schedule, maintaining an orderly work flow and certainly in
10       this case a skill would be reacting quickly and appropriately
11       to emergency situations.

13  (AR 158).  Based on the above transferable skills, the VE testified such
14  a Plaintiff would be able to perform "very basic semi-skilled jobs" and
15  "sedentary unskilled occupations."  (AR 159-60).  The ALJ specifically
16  clarified that the jobs stated by the VE did not "require any
17  significant overhead or over shoulder work."  (AR 159).  The VE stated
18  that they did not.  (Id.).  The ALJ further clarified that the VE had
19  to consider the limitation that Plaintiff could not "sit for six hours
20  out of eight but would have to stand up to relieve discomfort
21  [INAUDIBLE]."  (AR 160).  The VE confirmed that he had taken into
22  account the limitation and also noted that "[a]s long as the individual
23  could sit for about 30 minutes and then perhaps stand to relieve plain
24  or discomfort and continue working and then sit again," the Plaintiff
25  could perform occupations within the local and national economies.
26  (Id.).

27
28

As noted above, the VE testified that Plaintiff could perform basic semi-skilled and sedentary unskilled positions. (AR 159-60). Specifically, the VE mentioned that Plaintiff has the transferable skills to perform the occupations of an order clerk with 1,150 jobs in southern California, a routing clerk with 1,100 jobs, and a referral clerk with approximately 900 jobs existing in the southern California region. (AR 159). Further, the VE testified that Plaintiff could perform the sedentary unskilled occupations of product marker or labeler with 2,300 jobs in the region, an unskilled inspection clerk or inspector with 5,000 jobs, and a product folder with 2,500 jobs existing in southern California. (AR 160).

Plaintiff does not challenge the ALJ's RFC finding. However, Plaintiff does contend that the VE assumed a capacity "not contained in the hypothetical question." (Complaint Memo. at 7). Specifically, Plaintiff argues that the VE assumed Plaintiff "would always have the ability to persist in a seated position for about 30 minutes or that the variable and idiosyncratic nature of a pain pattern would not otherwise disrupt the sedentary nature of the work identified." (Id.).

Plaintiff argues that the ALJ never affirmatively found that capacity to exist. (Id.). Instead, Plaintiff argues the ALJ "specifically found that [Plaintiff] would required [sic] the 'opportunity to stand at will.'" (Id.). According to Plaintiff, "[s]tanding at will, when physical pain or discomfort demands a change of position, is far different than a capacity to sit for at least 30 minutes, continuing to work while standing, and then sitting again, the process of which taking an unspecified period of time." (Id.).

19

1    However, the Court disagrees with Plaintiff's assertion that the VE
2    assumed a capacity not contained in the ALJ's hypothetical.

4        Both the ALJ's assessment of Plaintiff's RFC and the VE's testimony
5    regarding Plaintiff's ability to perform occupations in the local and
6    national economies are consistent with each other.  See Bayliss v.
7    Barnhart, 427 F.3d 1211, 1217-18 (9th Cir. 2005) (holding proper the
8    ALJ's reliance on testimony the VE gave in response to a hypothetical
9    when the hypothetical posed by the ALJ contained all of the limitations
10   that the ALJ found credible and supported by substantial evidence in the
11   record).  During cross-examination by Plaintiff's counsel, the VE was
12   asked to define "at will."  (AR 162).  The VE testified that at will can
13   be described as "at any point in time in which the individual feels the
14   need to stand and to sit back down again."  (Id.).  It is clear from the
15   VE's testimony that based on the limitations incorporated in the ALJ's
16   hypothetical, the VE accounted for standing at will when concluding
17   Plaintiff could perform alternative occupations.  Thus, the ALJ
18   reasonably found the VE's interpretation of the RFC consistent with the
19   ALJ's assessment.

21   **B.   Even If The Vocational Expert Assumed A Capacity In Excess Of The**
22        **RFC, Any Error Was Harmless Because Plaintiff Could Still Perform**
23        **The Semi-Skilled Jobs Of Order Clerk, Routing Clerk, And Referral**
24        **Clerk**

26        The Ninth Circuit has held that an ALJ's error is harmless and no
27   remand is required if the outcome would have been the same, absent the
28   error.  See Carmickle v. Comm'r, 533 F.3d 1155, 1162 (9th Cir. 2008) (if

1  ALJ's error was inconsequential to the ultimate nondisability
2  determination, no remand required); Burch v. Barnhart, 400 F.3d 676, 679
3  (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors
4  that are harmless."). Here, any error was harmless because Plaintiff
5  could still perform the semi-skilled jobs of order clerk, routing clerk,
6  and referral clerk. Thus, no remand is required.

7

8      Plaintiff contends that the ALJ's finding that Plaintiff "needs to
9  stand at will," (AR 79), precludes Plaintiff from performing the
10 unskilled sedentary jobs of product marker, inspection clerk, and
11 product folder, as opined by the VE. (Reply in Support of Complaint
12 "Reply") at 3-5; see also Social Security Ruling (SSR) 83-12, 1983 WL
13 31253, at *4 (S.S.A. 1983) ("Unskilled types of jobs are particularly
14 structured so that a person cannot ordinarily sit or stand at will.").
15 However, based on the VE's testimony, Plaintiff does have transferable
16 specific vocational preparation ("SVP") level five skills obtained
17 during Plaintiff's past relevant work. (AR 33). Plaintiff acquired
18 communication and organizational skills, a knowledge of vehicles, the
19 ability to do paperwork and clerical activities, the ability to direct
20 the activities of drivers and communicate a schedule, and the ability
21 to maintain an orderly work flow. (Id.). Those skills can be applied
22 to meet the requirements of other semi-skilled jobs which allow the
23 Plaintiff the opportunity to stand at will. See Social Security Ruling
24 (SSR) 82-41, 1982 WL 31389, at *2 (S.S.A. 1982).

25

26     The VE testified that Plaintiff has the skill set necessary to
27 perform very basic semi-skilled jobs requiring SVP's of three or four,
28 such as order clerk, routing clerk, and referral clerk. (AR 159).

According to the Dictionary of Occupational Titles ("DOT"), jobs such as order clerk, routing clerk, and referral clerk, can all be performed by Plaintiff requiring the opportunity to stand at will.  An order clerk's main duties include:

> Process[ing] orders for material or merchandise received by
> mail, telephone, or personally from customer or company
> employee, manually or using computer or calculating machine:
> Edit[ing] orders received for price and nomenclature.
> Inform[ing] customer of unit prices, shipping date,
> anticipated delays, and any additional information needed by
> customer, using mail or telephone. Writ[ing] or types order
> form, or enters data into computer, to determine total cost
> for customer.  Record[ing] or files copy of orders received
> according to expected delivery date.

Dictionary of Occupational Titles, 249.362-026.  A routing clerk's main duties include:

> Determin[ing] truck routes involved and issu[ing] route slips
> to drivers to pick up donated clothing, furniture, and
> general merchandise for vocational rehabilitation
> organization: Review[ing] pre-sorted route slips and
> review[ing] street maps to determine appropriate route, based
> on type and quantity of merchandise pledged and location of
> donor.  Issu[ing] route slips to drivers.  Answer[ing]
> telephone and mail inquiries and complaints from donors
> concerning pickups; and advis[ing] drivers of problems or

22

1    reschedules pickup.  Occasionally tak[ing] pickup orders.
2    Prepar[ing]  daily  truck-collection  report  based  on
3    information from drivers, and keep[ing] attendance, safety,
4    and maintenance records.

6  Dictionary of Occupational Titles, 249.367-070. A referral clerk's main
7  duties include:

9    Compil[ing] and record[ing] information about temporary job
10    openings and refer[ring] qualified applicants from register
11    of temporary help agency: Answer[ing] call from hospital,
12    business, or other type of organization requesting temporary
13    workers and obtain[ing] and record[ing] job requirements.
14    Review[ing] records to locate registered workers who match
15    job requirements and are available for scheduled shift.
16    Notif[ying]  selected  workers  of  job  availability  and
17    record[ing]  referral  information  on  agency  records.
18    Sort[ing]  mail,  fil[ing]  records,  and  perform[ing]  other
19    clerical duties.

21  Dictionary of Occupational Titles, 205.367-062.  The duties for each
22  position noted above, as defined by the DOT, do not prevent Plaintiff
23  from performing the occupation, even if she requires the ability to
24  stand at will to relieve discomfort.  Because Plaintiff has acquired
25  work skills from past relevant work that are transferable to other
26  occupations with jobs existing in significant numbers in the local and
27  national economies, Plaintiff is not disabled.

28

1    In sum, the Court concludes that the VE assumed a capacity that is
2 consistent with the ALJ's assessment of Plaintiff's RFC and the ALJ
3 therefore properly relied on the VE's testimony.  Moreover, even if the
4 VE assumed a capacity in excess of Plaintiff's RFC, any error was
5 harmless because Plaintiff could still perform the semi-skilled jobs of
6 order clerk, routing clerk, and referral clerk.  Thus, no remand is
7 required.

8

9                                **VIII.**

10                            **CONCLUSION**

11

12    Consistent with the foregoing, and pursuant to sentence four of 42
13 U.S.C. § 405(g),[5] IT IS ORDERED that judgment be entered AFFIRMING the
14 decision of the Commissioner.  IT IS FURTHER ORDERED that the Clerk of
15 the Court serve copies of this Order and the Judgment on counsel for
16 both parties.

17

18 DATED: September 12, 2011.

19

20                              /S/
                                _____
21                              SUZANNE H. SEGAL
                                UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26  _____

27    [5]  This sentence provides: "The [district] court shall have power
   to enter, upon the pleadings and transcript of the record, a judgment
28 affirming, modifying, or reversing the decision of the Commissioner of
   Social Security, with or without remanding the cause for a rehearing."

                                   24

**THIS MEMORANDUM IS NOT INTENDED FOR PUBLICATION NOR IS INTENDED TO BE INCLUDED IN OR SUBMITTED TO ANY ONLINE SERVICE SUCH AS WESTLAW OR LEXIS.**